## Warman v. Commonwealth.

(Decided March 10, 1925.)

### Appeal from McCreary Circuit Court.

1. Homicide—Dying Declarations Properly Admitted.—Where deceased, who had received a fatal wound, told his father and brother he was not going to get well, and also told his wife that he was going to die, and did die within two or three hours thereafter, his dying declarations were properly admitted.

2. Homicide—Admission of Testimony Held Not Prejudicial where Objection was Sustained, and Jury was Admonished.—Admission of testimony of deceased's wife that deceased looked up at her and said, "I am going to die. Will you promise me you will live right and be a good woman?" was not prejudicial error, where court sustained objection thereto and admonished jury not to consider it, since court could not tell in advance what witness would say.

3. Homicide—Evidence Held Admissible on Issue of Aggression.— In prosecution for homicide, which occurred after defendant fired two shots near deceased's home, whereupon deceased went out and remonstrated with defendant, evidence as to deceased's wife's delicate condition, deceased's knowledge thereof, and effect of shots upon her, were properly admitted in explanation of deceased's conduct, and hence Commonwealth's attorney was not guilty of misconduct in persisting in effort to get such evidence before the jury.

4. Criminal Law—Asking by Commonwealth's Attorney of Improper Question, Not Permitted to be Answered, Not Misconduct.—The mere asking by Commonwealth's attorney of one improper question did not constitute misconduct on his part, nor result in prejudicial error, where court refused to permit witness to answer such question.

5. Criminal Law—Refusal to Permit Reading of Affidavit for Continuance as Deposition of Absent Witnesses Not Error, where no Diligence Shown.—Court did not err in refusing to permit defendant's affidavit to be read as deposition of certain absent witnesses and in denying continuance, where affidavit did not disclose that

defendant attempted to secure attendance of such witnesses or obtain their depositions.

STEPHENS & STEELEY, H. M. CLINE and W. H. CAYLOR for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

This is an appeal from a judgment convicting appellant of manslaughter, and fixing his punishment at twenty years' imprisonment.

The facts are these: There lived in Barthell, a mining camp in McCreary county, three namesakes of Admiral Dewey, namely Dewey Philipps, Dewey Brown, and appellant, Dewey Warman. They were all about the same age and were on friendly terms with each other. About three o'clock in the afternoon of April 16, 1924, Dewey Philipps and appellant were together and drank some whiskey, after which they separated. Later on, Dewey Philipps, Dewey Brown, and John Newport were at the home of Dewey Philipps dancing to the music of a victrola. There were also present Mrs. Philipps, Violet Pemberton, Mrs. Philipps' sister, and Bessie LeMar, a sister of Dewey Brown. Mrs. Philipps was in a delicate condition. Near the Philipps' home was a tram road along which appellant was traveling *en route* to the home of his mother. When he reached a point within a few feet of the Philipps' home he fired his pistol twice in answer, he claims, to some shots which had been fired over about the school house. When this occurred, Philipps, Brown and Newport left the house and went to the tram road. As to what occurred then the evidence is conflicting. The dying declaration of Dewey Philipps, as detailed by his brother, is as follows:

"A. He said somebody passed his house and shot twice right next to his house, said he went out and said Dewey Warman was out there and he asked him if it was him shooting and he told him 'Yes' it was him shooting and wanted to know what he was going to do about it, said he told him they had always been good friends and he didn't want to have trouble, and said he wasn't going to do nothing to him, and my brother said his wife was not in shape for anybody to be shooting or cutting up around the house,

and said two more fellows come up, Dewey Brown and John Newport, and said Dewey Warman said he had three more shells in his gun, one for each one of them and called their names—

"Q. 42. Whose names? A. Dewey Brown, John Newport and Dewey Philipps, said he told him 'No' he didn't want to do nothing like that, said 'You are drinking, I'll go on out home with you and help you get home,' and he said he didn't need any help to get home, said that was about all that was said, said they stood there talking friendly, didn't say what else was said, and he turned and started to go back in the house and said 'He shot me.'

"Q. 43. Did he say how many times he shot him? A. Said he shot him twice.

"Q. 44. Do you remember anything else he said about the transaction? A. He said he told him when they was talking about trouble, said he told him he had drunk some liquor with him that evening and didn't want to have no trouble with him.

"Q. 45. Do you recall anything else he said? A. No. I reckon that is all I can remember.

"Q. 46. Do you remember whether he said in the statement anything about whether he or Dewey Brown or John Newport were doing anything to the defendant or not when the shooting was done? A. Yes, sir. He said that there wasn't no licks struck nor nothing, just standing there talking, wasn't nothing at all, didn't have no reason at all—"

Cousel for appellant objected to the foregoing statement and the court admonished the jury not to consider the statement that there was no reason for him to shoot.

M. H. Phillips, the father of the deceased, gives the following as his dying statement:

"A. He said he come out of the mines about 2:30, quit work at about 2:30 and come out of the mines, and met Dewey Warman and two more fellows on the tramway between the bath house and the mouth of the mines and they had some whiskey in a quart bottle—

"Q. 22. Said who had it? A. Dewey Warman and the two fellows, he called their names, but I don't remember the two fellows he said was with Dewey Warman, and they asked him to drink and he took a couple of drinks and said he tried to beg off

from him to go on, and said he stayed till something like four o'clock, when he left Dewey Warman and the other two fellows and went on to the bath house, and went on by home and left his dinner bucket, went to the bath house and took a bath and went back home, and he says, 'You know we had been up here to the hospital with Violet and we got some new victrola records and was playing them. . . . And he said somebody passed and shot right at the corner of his house and he went out to see who it was and it was Dewey Warman, and he says 'Dewey, was that you shot?' and said, 'Is anybody hurt?' and he says 'No,' says 'I shot, but there is nobody hurt,' and he says 'What did you come and shoot by my house for?' and he says 'What's it to you? and who wants to know?' and he said 'That's all right, Dewey, you have done shot,' and he says 'Now the best thing to do is to go to the house,' says 'You are drinking, I'll take you down to the house with me if you want to go,' said by that time he had got where Dewey Warman was, and John Newport and Dewey Brown got there about the same time, and said he told Dewey it was all right that he would overlook the shooting, that they had always been good friends, said they had quit talking about the shooting and was just standing there and he says, 'I was in my shirt sleeves and had a package of cigarettes and took out a cigarette and put it in his mouth and says I told them I was going back in the house,' and said 'Just as I turned round and started back in the house he shot me,' said 'I didn't know he was mad at me or nothing.' "

John Newport testified that after the first two shots were fired deceased and Brown left the house, followed by him. He saw three men standing on the tramway, appellant, Brown and the deceased. They seemed to be engaged in conversation, but he could not understand what they said. As he approached the scene he did not see Brown strike appellant, or deceased attempt to strike appellant. Deceased had nothing in his hands with which to strike appellant, and there was no weapon on his person. Witness admitted on cross-examination that after the shooting he saw appellant, and his head was bloody. However, it was shown by Mrs. LeMar that immediately after the deceased fell, appellant started to run away,

but was caught by her brother, Dewey Brown, who struck him on the head several times. Appellant said to Brown, "You have killed me." Brown replied, "I had to do this, Dewey, you was going to kill all three of us." Appellant said, "I know it." She further asked appellant if he would tell his brothers that her brother had to do that, or he would have killed all three of them. Appellant said, "I will." Afterwards appellant was taken to the boarding house, where Mrs. LeMar bathed his head with water. When the sheriff was called, appellant jumped off the bed and ran out of the house. The deceased was shot twice in the left side. He was first carried to his home and then to Dr. Cain's hospital at Somerset, where he died the next morning.

According to appellant, he and Dewey Philipps were friends and had been drinking together the afternoon before the difficulty. After explaining that he was on his way to his mother's and had fired two shots near the home of Dewey Philipps in response to shots fired over at the school house, his testimony is in substance as follows: Dewey Philipps and Dewey Brown came out of the house and walked up to his side. Dewey Philipps wanted to know what in the hell made him shoot. He replied that he just shot to be doing it and didn't mean it. Dewey Brown then knocked him down. About that time he saw John Newport approaching. At that time he had his pistol in his pocket. As he got up he saw Dewey Philipps with a rock in his hand and his hand drawn back prepared to throw, and he shot because he thought they were going to kill him. After shooting he was scared and started to run. Dewey Brown caught him, took his pistol out of his pocket and beat him over the head with it four or five times.

The dying declarations were properly admitted. The deceased not only told his father and brother he was not going to get well, but told his wife that he was going to die, and, as a matter of fact, he had received a fatal wound, and did die within two or three hours after his dying statements were made.

It may be that the statements in some instances included narratives of matters not immediately connected with the homicide, but as these matters were immaterial, and some of them were admitted by appellant, we do not regard their inclusion in the dying statements as prejudicial error.

The further point is made that the court erred in the admission of evidence, and that the Commonwealth's attorney was guilty of misconduct in repeatedly asking questions after the court had ruled that they were improper. Attention is first called to the fact that Flora Philipps, the wife of the deceased, testified that the deceased looked up at her and said, "Flora, I'm going to die. Will you promise me you will live right and be a good woman?" Though the court sustained an objection to this answer, and admonished the jury not to consider it, it is claimed that the action of the court came too late as the harm had already been done. We are unable to agree with this contention. The court could not tell in advance what the witness would say. As soon as she did answer, the court made it clear to the jury that they could not consider the statement, and there is no justification for the claim that the statement was of that far-reaching and prejudicial character that its effect could not be removed by proper admonition.

In examining the same witness we find the following questions, answers and rulings, which are made the basis of the charge that the Commonwealth's attorney was guilty of misconduct:

"Q. 99. Were you, at the time your husband was killed in a delicate condition?

"Counsel for defendant objected to the foregoing question and the court overruled said objection, to which action and ruling of the court defendant at the time excepted.

"A. Yes, sir.

"Q. 100. I will ask you if the report of those two shots you heard didn't frighten you?

"Counsel for defendant objected to the foregoing question and the court sustained said objection, to which action and ruling of the court counsel for plaintiff excepted.

"Q. 101. What effect did the first two shots you heard have on you?

"Counsel for defendant objected to the foregoing question and the court sustained said objection, to which action and ruling of the court counsel for plaintiff excepted.

"Q. 102. Tell the jury if at that time your husband knew the condition you were in? A. Yes, sir.

"Q. 103. State to the jury what effect the last of these shots had on you at the time you first heard them?

. "Counsel for defendant objected to the foregoing question and the court overruled said objection, to which action and ruling of the court defendant at the time excepted.

"A.  Well, it scared me, I didn't know what it was.  I thought it was in the house.  When I first heard it I thought they had shot into the house.

"Q. 104.  Tell the jury if after that time you miscarried?

"Counsel for defendant objected to the foregoing question and the court sustained said objection, to which action and ruling of the court counsel for plaintiff excepted.

The question for the jury was, who was the aggressor? and any fact bearing on either party's attitude of mind toward the other was properly admissible.  If the jury had not been apprised of the circumstances that prompted the deceased to leave the house and accost appellant, they might have concluded that he was at fault and responsible for the resulting difficulty.  We therefore conclude that Mrs. Philipps' condition, her husband's knowledge thereof, and the effect of the shots upon her, were properly admitted in explanation of the conduct and purpose of her husband in intercepting appellant and remonstrating with him for firing the shots in such close proximity to her home.  Having this view of the question it can not be said that the Commonwealth's attorney was guilty of misconduct in persisting in the effort to get the evidence before the jury.  The only impropriety was in asking the last question, but as one improper question does not amount to misconduct, and the court refused to permit the witness to answer, it can not be said that the mere asking of the question was prejudicial error.

The court permitted appellant's affidavit for a continuance to be read as the deposition of certain witnesses, but declined to permit it to be read as the deposition of Dewey Brown and Dr. Cain.  The affidavit does not disclose that appellant took any steps whatever to secure the attendance of the witnesses or obtain their depositions.  All that appears is that Dewey Brown was one of the witnesses named in the indictment, and it was not shown that he was summoned by the Commonwealth.

There being no showing of diligence, the court did not err either in refusing a continuance or declining to permit the affidavit to be read as the depositions of the absent witnesses. Glisper v. Commonwealth, 186 Ky. 276, 217 S. W. 348; Armstrong v. Commonwealth, 177 Ky. 690, 198 S. W. 24.

On the whole, we find no error in the record prejudicial to the substantial rights of appellant.

Judgment affirmed.